No. 79-115

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

---

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

BILLIE LEON PENDERGRASS,

Defendant and Appellant.

---

Appeal from: District Court of the First Judicial District,
In and for the County of Lewis and Clark.
Honorable M. James Sorte, Judge presiding.

Counsel of Record:

For Appellant:

Peter M. Meloy argued, Helena, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Charles Graveley argued, County Attorney, Helena, Montana

---

Submitted: May 22, 1980

Decided: August 11, 1980

Filed: AUG 11 1980

Thomas J. Kearney
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

Defendant Billie Leon Pendergrass was convicted of attempted robbery and sexual intercourse without consent in October, 1977. The convictions were reversed by this Court and the case was remanded to the Lewis and Clark County District Court in October, 1978. State v. Pendergrass (1978), ____Mont.____, 586 P.2d 691, 35 St.Rep. 1512. (Hereinafter Pendergrass I.) A trial was held and defendant was convicted of sexual intercourse without consent. He again appeals.

Around midnight on June 26, 1977, the lone employee at Terry's Convenient Foods in Helena, Montana, was finishing her shift. She had let the last customer out the front door, locked it, shut off the outside lights, and was standing at the checkout counter writing a note to her employer. Suddenly, she was grabbed from behind by someone who put his right arm around her waist and his left arm around her shoulder, covering her face with his left hand which held a knife. A male voice told her not to scream or fight.

While forcing her to the back of the store, the man asked the girl where the key was. Thinking that the man intended to rob the store, she replied that the safe was a combination safe. He asked the combination and whether there was any money left in the cash registers.

The man then forced her into a restroom in the rear of the store and raped her. The girl, who had been told in a college course that a victim of such an assault should make every effort not to see her attacker, to minimize the danger of reprisal should he later fear he might be identified, kept her eyes averted and her hands over her face throughout the entire incident. She does not know what her assailant looked like.

The victim testified that she was grabbed at approximately 12:05 a.m., that it took less than five minutes for the man to force her to the back of the store and that the rape lasted

- 2 -

perhaps ten minutes.

After the rape, the man bound the girl's hands and feet with tie strings from a grocery apron and asked her where the key to the front door was. She told him the key was on the counter. He left her lying on the restroom floor. After two unsuccessful attempts to find the key, he finally located it and left. The girl, still bound and unclothed, hopped to the front of the store and contacted the police by telephone. It was 12:34 a.m.

When police officers arrived at the scene of the crime, a resident of the area informed them that an unfamiliar red pickup truck had been parked in front of his home. He later testified that he noticed the truck at approximately 11:30 p.m., that it was still present at approximately 12:10 a.m. or 12:15 a.m., and that it was no longer in the area at approximately 12:30 a.m. when he heard police sirens. Another witness testified that immediately after hearing the police report on his scanner he saw a reddish truck proceeding toward East Helena. At approximately 2:30 a.m. the police, accompanied by the witness who had first described the truck, located the vehicle in an alley in East Helena.

Several witnesses placed this truck in the 1800 block on Ninth Avenue, one block south of the scene of the crime, between 11:30 p.m. and 12:20 a.m., the period of time in which the crime occurred. One of these witnesses testified that he left his home to walk to Terry's Convenient Foods, a distance of one block, at approximately 11:30 p.m. On his way home he noticed a sparkly reddish pickup truck "cruising very slowly" along Ninth Avenue. The witness characterized the movements of the truck as "sort of peculiar." He saw a well-muscled, stockily-built caucasion with high cheek bones and collar length light brown hair get out of the truck and walk towards Terry's. The witness then recorded the truck's license number, 5T-11046. This general description matches that of the defendant, and the defendant is the registered owner of a truck with that license number. The witness later told a police officer that he was not sure that

- 3 -

he would recognize the person if he saw him face to face. However, when this witness was shown a photographic array, he selected the defendant's picture as the one in the selection of six which "most closely resembled the man I saw get out of that truck." On cross-examination of this witness, defense counsel brought out that each of the persons in the photographs not selected had different features than the defendant. These distinguishing characteristics included eyeglasses, different hair color, different hair lengths, and different builds.

Another witness testified that he saw a man behind the counter at Terry's when he drove past the store at approximately 12:15 to 12:20 a.m. He described the man as being fairly tall, but under six foot, with collar length, sandy brown hair.

Medical evidence obtained from testing semen stains on the victim's clothing and from testing samples taken in a physical examination of the victim shortly after the crime, reveals that the perpetrator was a type "A" blood type and a secretor, as is the defendant. However, 32% of the male population are type "A" secretors.

On July 13, 1977, defendant was charged with the crimes of attempted robbery and sexual intercourse without consent in the Lewis and Clark County District Court.

The case came on for trial on October 3, 1977. On October 7, 1977, a jury found defendant guilty of both offenses. In a judgment entered on November 4, 1977, the District Court sentenced defendant to the Montana State Prison for 20 years for the crime of sexual intercourse without consent, and 40 years for the crime of attempted robbery, the sentences to run consecutively.

This Court reversed the convictions and remanded the case for retrial, holding that a tape recording of the victim's telephone call to the police for assistance was unduly prejudicial under Rule 403, Mont.R.Evid.

At the commencement of the second trial, on January 22, 1979, the handcuffed defendant was led past the jury panel

- 4 -

in the hallway outside the courtroom by officers of the Lewis and Clark County sheriff's office. Immediately thereafter, the defendant's motion for a mistrial was denied.

The following "omnibus" jury instruction was given without objection:

> "You are instructed that evidence is to be considered not only by its own intrinsic weight, but also according to the evidence which is within the power of one side to produce and of the other to contradict; and therefore, if weaker and less satisfactory evidence is offered, when it appears that stronger or more satisfactory could have been produced, the evidence offered should be viewed with distrust."

The defendant did not take the stand nor call any witnesses. A motion for directed verdicts on both charges was denied. The jury found the defendant guilty of sexual intercourse without consent and not guilty of attempted robbery. He was sentenced to 20 years in the Montana State Prison.

The following issues have been raised on appeal:

1. Whether the photographic identification procedures were constitutionally infirm.

2. Whether it was reversible error for the trial court to deny the defendant's motion for a mistrial because the state had caused the defendant to appear in handcuffs before the jury panel.

3. Whether it was reversible error for the court to deny the defendant's motion for a directed verdict on the grounds that there was not sufficient evidence to support the charge of sexual intercourse without consent.

4. Whether it was reversible error for the trial court to instruct the jury to view weaker evidence with distrust when it appears stronger evidence was available.

The photographic identification issue was raised in Pendergrass I and disposed of as follows:

> "For the guidance of the District Court on retrial, we address the remaining issues which may recur at the second trial.
>
> "Defendant contends that the pretrial photographic identification procedure and the trial identification of the defendant violated his

- 5 -

due process rights. He argues that of the array of photographs shown the witness prior to trial, only his photograph matched the description the witness had previously given the police.

"We have examined the array of photographs and find defendant's contention without substance. His photograph is not the only photograph matching the description previously given by the witness. The array is not unduly suggestive in our view. ' . . .[u]nless the error is obvious and the prejudice clear, the defendant's remedy is in effective cross-examination with the identification question then becoming one of weight to be determined by the jury and not one of admissibility.' State v. Miner (1976), 169 Mont 260, 546 P.2d 252, 256. We find no error here." Pendergrass I, 586 P.2d at 695, 35 St.Rep. at 1516.

The defendant, in this appeal, contends that the cross-examination of the identifying witness in the second trial, establishes that the identification procedures were unduly prejudicial because of the witness's ability to eliminate the other five photographs due to the persons' build, glasses, hair length, or hair color and because the witness merely identified defendant's photograph as most nearly resembling the man he saw.

In finding the defendant's contention without merit, we adhere to our discussion in Pendergrass I. In addition, this case differs substantially from the typical photographic array case where the witness looks at a photograph, makes a positive identification which is cemented in his mind, and then positively identifies the defendant in court. Here, the witness merely identified the defendant's photograph as the photograph which most closely resembled the man he saw get out of the pickup truck and walk toward Terry's Convenient Foods. No in-court identification was made. The witness also testified that he told a police officer that he was not sure he could identify the man he saw if he saw him face-to-face. Cross-examination brought out the fact that the witness was able to eliminate the other five photographs because of either a difference in build, hair color, hair length, or eyeglasses. Thus, the defendant was able to diminish the weight that a juror would give to the already limited testimony that defendant's photograph was the one in the six-photo array

- 6 -

"which most closely resembled" the man he saw.

Although Manson v. Brathwaite (1977), 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140, is distinguishable on the facts, we find the following language in that opinion to best summarize our disposition of this issue.

> "Surely, we cannot say that under all the circumstances of this case there is 'a very substantial likelihood of irreparable misidentification.' (Cite omitted.) Short of that point, such evidence is for the jury to weigh. We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 432 U.S. at 116, 97 S.Ct. at 2254, 53 L.Ed.2d at 155.

The defendant next contends that he was denied a fair trial by the District Court's denial of his mistrial motion. The basis of this contention is that allowing him to be seen by the jury panel in handcuffs prior to the commencement of trial affected the presumption of innocence.

A similar issue was presented to this Court in State v. Baugh (1977), 174 Mont. 456, 571 P.2d 779. Five days after the trial commenced, the defendant was brought into the courtroom in handcuffs. Defendant's immediate motion for a mistrial was denied; however, a ruling was reserved until after the verdict in order for the District Court to question the jurors as to the creation of any prejudice because of the scene. The court determined that the incident did not affect the jury's deliberation. In addressing the issue on appeal this Court stated:

> "The majority rule is that, absent unusual circumstances, a prisoner brought into court for trial is entitled to appear free from all bonds or shackles, this right being an important component of a fair and impartial trial. However, in State v. Jones, 130 N.J. Super. 596, 328 A.2d 41 (1974), the court held defendant's right to be free of shackles during trial need not be extended to the right to be free of shackles while being taken back and forth between the courthouse and the jail. Most courts now agree with Sawyer that a defendant is not denied a fair trial and is not entitled to a mistrial solely because he was momentarily and inadvertently seen in handcuffs by jury members.

> "In the instant case counsel for defendant admits the jury was well aware of the fact defendant was in custody and not free on bail. There is no indication this occurrence was prejudicial. _In the absence of an indication of prejudicial consequences, such an occurrence does not warrant the granting of a new trial._ (Emphasis added.)" 174 Mont. at 462-463, 571 P.2d at ~~702~~ 783.

In the present case defendant was "momentarily and inadvertently seen in handcuffs" by prospective jury members. There is no indication of prejudicial consequences in the record. In addition, the jurors knew that an information had been filed and the defendant arrested, and the District Court gave numerous instructions on the presumption of innocence and the burden of proof. Under these circumstances we find no denial of a fair trial.

The defendant also contends that there is not sufficient evidence to support the conviction of sexual intercourse without consent. This Court also addressed an issue concerning sufficiency of the evidence in _Pendergrass_ _I_ in relation to the prior attempted robbery conviction. We there stated:

> " . . . 'This Court remains ever mindful of one fundamental rule--that questions of fact must be determined solely by the jury, and that given a certain legal minimum of evidence, this Court on review will not substitute its judgment for that of the jury . . . On appeal we examine the evidence to determine whether the verdict is supported by substantial evidence. In so doing, we view the evidence in the light most favorable to the State.' State v. Merseal (1975), 167 Mont. 412, 415, 538 P.2d 1366, 1367-1368. (Citing cases.) Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' _Merseal_, 167 Mont. at 416, 538 P.2d at 1368." 586 P.2d at 697-698, 35 St.Rep. at 1520.

In our present case there is no question that a rape occurred, and the following evidence was adduced at trial which tends to prove that the defendant committed the crime: (1) defendant owns a distinguished red pickup truck which was seen being parked near the scene of the crime shortly after 11:30 p.m. by a witness; (2) this witness observed a man get out of the

- 8 -

truck and begin walking towards Terry's Convenient Foods; (3) he also recorded the license number which had been issued to the defendant; (4) he further described the man to the police as stockily built, 5'10", caucasian with light brown, collar-length hair and high cheek bones, and later selected defendant's picture from six photographs as the one most closely resembling the man he saw; (5) another witness testified that a red truck had been parked in front of his residence between 11:30 p.m. and 12:10 a.m. but the truck was no longer present at approximately 12:30 a.m.; (6) this witness later identified the truck as that of the defendant and this identification was corroborated by a house guest of the witness; (7) three other witnesses placed defendant's truck in front of the witness's residence between 11:30 p.m. and 12:20 a.m.; (8) a witness who drove by Terry's testified that he saw a man near the counter in Terry's at approximately 12:20 a.m.; (9) he described the man as six feet or under with sandy-colored hair, between collar and shoulder length; (10) Kim Gardner, the victim, testified that she had locked the store at 11:56 p.m. and was attacked shortly thereafter by a person hiding in the store; (11) she also said that the assailant made two unsuccessful attempts to locate a key which she had told him was on the counter; (12) medical evidence reveals that the defendant's blood type matches that of the perpetrator.

In viewing the preceding evidence in the light most favorable to the State, we find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" of guilt beyond a reasonable doubt.

The defendant's final contention is that the following
and
jury instruction is constitutionally infirm/constitutes reversible error:

> "You are instructed that evidence is to be considered not only by its own intrinsic weight, but also according to the evidence which is within the power of one side to produce and of the other to contradict; and therefore, if

weaker and less satisfactory evidence is
offered, when it appears that stronger or more
satisfactory could have been produced, the evi-
dence offered should be viewed with distrust."

It is argued that this instruction adversely affects the
presumption of innocence and allows the jury to draw an inference
from defendant's failure to take the stand. Although this
instruction might be objectionable in a case where the defendant
testifies or offers evidence, the instruction is not prejudicial
where, as here, the defendant does not take the stand or offer
any evidence. The instruction states "if weaker and less satis-
factory evidence is offered . . . the evidence offered should be
viewed with distrust." Only the State offered evidence, and pur-
suant to this instruction, only the State's evidence offered can
be viewed with distrust. Nothing in this instruction affects the
presumption of innocence or defendant's right against self-
incrimination when he does not take the stand.

We must also point out that the District Court extensively
instructed the jury on the presumption of innocence, the burden of
proof and the impropriety of drawing an inference from defendant's
failure to take the stand.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

- 10 -