Charles Carlos SMITH,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 88–116.

Supreme Court of Wyoming.

April 24, 1989.

David Serelson, Asst. Public Defender,
Public Defender Program, for appellant.

Joseph B. Meyer, Atty. Gen., John W.
Renneisen, Deputy Atty. Gen., Karen A.
Byrne, Sr. Asst. Atty. Gen., and Paul S.
Rehurek, Asst. Atty. Gen., for appellee.

Before THOMAS, URBIGKIT, MACY
and GOLDEN, JJ., and LANGDON,
District Judge.

LANGDON, District Judge.

Appellant Charles Carlos Smith was con-
victed of murder in the second degree in
the killing of William J. Duplantis, Jr., in

Sublette County. The killing occurred on May 6, 1987. On March 9, 1988, he was sentenced to the Wyoming State Penitentiary for a term of twenty to twenty-five years, with a maximum/minimum credit of 302 days already served in the local jails. It is from this sentence that appellant appeals.

Appellant presents the following issues:

Issue I

Did the trial court err in denying Appellant's motion for a mistrial when Appellant was seen in handcuffs by jurors?

Issue II

Did the trial court err in refusing to instruct the jury on self-defense or defense of others?

Issue III

Did the trial court improperly limit voir dire or err in failing to excuse a juror for cause?

Issue IV

Was Appellant denied his right to a trial by jury?

Issue V

Was it an abuse of discretion to allow notetaking by the jury or error [not] to instruct the jury on notetaking at the close of the case?

We affirm the trial court on all of these issues.

The principals in this sad escapade are appellant, the decedent, and Matthew Wilder (the nineteen-year-old son of Teddy Dabney, the woman with whom appellant had been living in Pinedale, Wyoming). Dabney and appellant had a domestic argument, resulting in a request by Dabney that appellant leave her quarters. He agreed and suggested that he be allowed to take Wilder with him to Oklahoma to work on a farm owned by appellant's mother. Dabney agreed, as did Wilder. Appellant had formerly been employed on a nearby ranch in Sublette County, and he and Wilder proceeded to said ranch in order to pick up appellant's belongings. There they encountered the decedent, who had been employed at the ranch after appellant had terminated his own employment. The decedent invited appellant and Wilder to his cabin, where drinking commenced in ear-

nest by appellant and the decedent and which matured into a fight, leading to a nonfatal slashing and stabbing of the decedent by appellant. Angered, the decedent attempted to reach a gun. In order to prevent this, appellant kicked the decedent in various and sundry parts of his body, rendering him immobile. Appellant then gave Wilder the subject gun to "hold on" the decedent while appellant tied the decedent's hands and feet. They placed the decedent in appellant's car and drove to the place where the killing occurred. There they removed the decedent from the car. Appellant took off the rope bindings and told Wilder to remain with the car. This occurred during the late hours of May 5 or the early hours of May 6, 1987. Shots were fired, after which appellant alone returned to the car. Wilder and appellant went to Pinedale, Wyoming, where they cleaned the blood out of the car and burned the soiled clothing. They thereafter left, heading for the Sunlight Basin north of Powell. It was in Powell, about a week later, where they turned themselves in.

Late in the morning of May 6, 1987, while on his way to Daniel, on U.S. Highway 189 near the Faler Creek bridge, one Jerry Lopez saw the decedent lying face down in Faler Creek. Subsequent investigation by law officers and state investigators disclosed that, in addition to the injuries previously mentioned, the decedent had suffered two gunshot wounds in the back of his head and that he was very much dead.

## HANDCUFFS

■ The evidence discloses that the courthouse in Sublette County is somewhat cramped and that a criminal jury trial presents special space problems. The back porch of the courthouse was one of the designated smoking areas, and three jurors, taking advantage of same and in order to enjoy their smoking, observed appellant being transferred from the jail to the courtroom before an afternoon session. Appellant was wearing handcuffs. (There were no restraints upon the person of ap-

pellant during the course of the court proceedings themselves.) Appellant claims this to be a violation of his Sixth Amendment and Fourteenth Amendment rights to a fair trial because it prejudiced the jurors who saw him. Prior to the commencement of said afternoon session, appellant moved for a mistrial because of the incident. There was nothing in the record which identifies the three jurors, nor is there any evidence presented to show that appellant was prejudiced thereby. As a practical matter, in the case at bar the jury had already been selected and had heard one-half day of testimony, with appellant being present in the courtroom. Also, prior to that, the jury had listened to a day of jury *voir dire* examination touching on aspects of the case, including certainty of a murder, the identity of appellant, and the reasons for both the jurors and appellant being at the courthouse. The encounter was simply a brief and incidental one of no particular significance.

The general law applicable in situations where jurors see a handcuffed defendant is that, absent a showing of prejudice, their observations do not constitute grounds for a mistrial because of fundamental constitutional error. *Gates v. Zant*, 863 F.2d 1492 (11th Cir.1989); *Hamrick v. People*, 624 P.2d 1320 (Colo.1981); *State v. Moreno*, 128 Ariz. 33, 623 P.2d 822 (Ct.App.1980); *State v. Williams*, 48 Or.App. 319, 617 P.2d 629 (1980); *State v. Pendergrass*, 189 Mont. 127, 615 P.2d 201 (1980).

> As stated in *Gates*, 863 F.2d at 1501:
> [A] defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. * * * [T]he courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.

### INSTRUCTION ON SELF–DEFENSE OR DEFENSE OF ANOTHER

It is not quite clear from the record whether appellant complied with the requirements of W.R.Cr.P. 31 and W.R.C.P. 51 in dealing with the trial court's refusal to give an instruction on the issues of self-defense and defense of another. W.R.Cr.P. 31 requires that objections to instructions shall be made in the manner set forth in W.R.C.P. 51. W.R.C.P. 51 requires that objections be made before the jury retires to consider its verdict and that the objections must distinctly state the matter to which they are made and the grounds therefor.

Appellant did offer an instruction on self-defense and defense of another, instruction number 13, and submitted a brief in support thereof. This instruction was refused by the court. Neither the record nor the transcript reveals compliance by appellant with W.R.Cr.P. 31 and W.R.C.P. 51, and the State urges that the objection is waived.

■ Appellant raises the Sixth Amendment and Fourteenth Amendment violations, arising from the trial court's refusal to give an instruction on self-defense and defense of another, as were raised in the handcuff issue. We reach the same constitutional conclusion. Without question, an accused has a right to instructions upon his or her theories of the case and his or her defenses thereto if: (1) the instructions are sufficient to inform what these theories consist of, and (2) there is competent evidence to support the law expressed in said proposed instructions. *Sanchez v. State*, 694 P.2d 726 (Wyo.1985).

■ That appellant proffered a legally sufficient instruction is not the issue; the issue is the development at trial of the supporting competent evidence. Appellant urges, as support for the need for the instruction, that decedent had previously been arrested for attempted homicide, had owned a handgun, and had previously shot two people, as based upon a newspaper clipping. When considered in the light of the events transpiring immediately prior to the killing, these facts, even if true, are irrelevant.

■ The events occurring prior the killing of the decedent—i.e., the slashing and stabbing of the decedent, the attempt by the decedent to retrieve his gun, the beating of the decedent by appellant and the

recovery by appellant of the decedent's gun, the binding of the decedent's hands and feet at gunpoint and the subsequent transportation of the decedent by appellant and Wilder to the scene of the killing, the removal of the decedent by appellant from the vehicle and the taking of the decedent to the creek beside the highway, and the unequivocal testimony of appellant that he did not shoot the decedent but that Wilder did so accidentally—collectively do not constitute evidence to support self-defense or defense of another.

■ "Self-defense" has been defined as a justifiable homicide

> where the slayer, in the careful and proper use of his faculties, *bona fide believes,* and has reasonable ground to believe that he is in imminent danger of death or great bodily harm, and that his only means of escape from such danger will be by taking the life of his assailant, although in fact he is mistaken as to the existence or imminence of the danger.

*Foley v. State,* 11 Wyo. 464, 480, 72 P. 627 (1903) (emphasis in original). This definition is as valid today as it was eighty-six years ago. *See Best v. State,* 769 P.2d 385 (Wyo.1989); *Jahnke v. State,* 682 P.2d 991 (Wyo.1984); *Leeper v. State,* 589 P.2d 379 (Wyo.1979); and *Nunez v. State,* 383 P.2d 726 (Wyo.1963). In the alternate situation wherein there are an assailant, a defendant, and a defender—i.e., defense of another—the standards are not changed. The defender is justified in using force if he or she reasonably believes that the person defended is in immediate danger of unlawfully inflicted bodily harm and that the force is reasonable and necessary to prevent same. *Leeper,* 589 P.2d 379. The development of the theories of self-defense and defense of another did not materialize.

### FAILURE TO EXCUSE JUROR

■ Appellant complains because the trial court, after a rather extensive *voir dire,* refused to excuse for cause juror Barbara Lauger. Though all sixteen peremptory challenges had been exercised by that time, after refusing to excuse Mrs. Lauger, the trial judge allowed appellant one more peremptory challenge. Appellant elected not to exercise that challenge, and Mrs. Lauger served on the panel to the conclusion of the case and the rendition of the verdict against appellant.

Wyo.Stat. § 7–11–105(a)(ii) (1977) authorizes the challenge of a prospective juror who

> has formed or expressed an opinion as to the guilt or innocence of the accused, or is biased or prejudiced for or against the accused[.]

This challenge, of course, is developed through the process of *voir dire,* and appellant claims that he was deprived of *voir dire* by the court during the examination. In other words, appellant claims that he was denied the right to secure a fair, competent, impartial, unprejudiced juror. The dialogue among the court, counsel, and Mrs. Lauger disclosed that she worked in an arcade, that she had overheard "kids" talking about the incident, and that this caused her to then have an opinion which she no longer had at the time of the *voir dire.* Mrs. Lauger clearly stated on several occasions during *voir dire* that she could put aside the rumors and decide the case on the evidence and that she could be fair to both sides. Appellant complains that he had used all of his peremptory challenges and that, therefore, Mrs. Lauger remained on the jury. The transcript does not reflect such "stonewalling" by the trial judge. The transcript discloses that the trial judge, though refusing to excuse Mrs. Lauger for cause, gave appellant the right to exercise an additional (ninth) peremptory challenge, which appellant did not exercise. In effect, the trial judge would have excused Mrs. Lauger if appellant wished her to be excused, and he gave appellant the ultimate choice, whether it be called peremptory or for cause. The result which appellant sought was available to him. As Mr. Shakespeare said, "What's in a name? That which we call a rose by any other name would smell as sweet." The propriety of an additional challenge was never questioned by appellant or the State, and, in effect, appellant received a challenge for cause.

Be these as they may, clearly, the qualification of Mrs. Lauger and her responses to questions by the court and counsel are in compliance with the positive guidelines of Wyo.Stat. § 7–11–106 (1977):

> (a) It is not cause for challenge that a person called to act as a juror in a criminal case has formed or expressed an opinion as to the guilt or innocence of the accused from news media reports or rumor if:
>
> > (i) The prospective juror states that he can lay aside his impression or opinion and render a verdict based on the evidence presented in court;  and
> >
> > (ii) The court is satisfied, from the examination of the prospective juror or from other evidence, that he will render an impartial verdict according to the law and the evidence submitted to the jury at trial.

### DENIAL OF RIGHT TO JURY TRIAL

■ Appellant maintains that he was deprived of the right to a fair trial for the reason that one of the jurors was asleep during a portion of the trial. During the course of the trial, the State proposed to show to the jury a videotape of the scene of the killing, including the removal of the victim from the scene. Appellant objected to this because the audio portion of the tape contained remarks of the sheriff, which appellant claimed to be prejudicial and inflammatory, and because the video picture, without the audio, was repetitious —having been previously shown to the jury by still photographs. Appellant also claimed that the picture of the removal of the body was prejudicial and inflammatory. The trial court deleted the audio portion of the tape, and the State proceeded to show the jury only the video. At the conclusion of the showing, the court made this remark:

> [T]his video must not have been too inflammatory or exciting. One of the jurors was asleep and 3 people [who] got up to watch it left.

There is no evidence in the transcript of a sleeping juror other than this offhand remark of the trial judge;  nor did appellant present authority or cogent argument in support of his objection. The record discloses only that appellant objected to the showing of the video because it was cumulative in that the entire scene had been photographed, that the jury had seen the entire scene, and that the video was just more pictures of the scene. As further objection, appellant claimed that the video photos of the removal of the body of the decedent from the scene were inflammatory because of "rigor mortis and all that type of thing involved." There was no showing by appellant, other than the bare statement of the view being inflammatory, that the jurors who viewed the video were inflamed in what was otherwise a noninflammatory trial. It is difficult for us to find error in favor of appellant if a juror failed to see that which appellant asserts that he or she had already seen or that which he or she should not have seen. Was there prejudicial conduct from the standpoint of appellant? We believe not. Based upon appellant's objections to the showing of the video, it would seem that only the State could have been prejudiced if, in fact, a juror fell asleep. An analogous situation occurred in *State v. Pace*, 527 P.2d 658 (Utah 1974). The Supreme Court of Utah disposed of the matter thusly:

> Two onlookers said two of the jurors consciously went to sleep. The trial judge, not charged with somnambulism, in denying the motion for mistrial, said that he had observed the whole jury; that one had *not* gone to sleep, and the other did "doze for a second, twice" but had aroused before he, (the judge) "had a chance to call it to her, (the juror's), attention." Hence there seems to have been nothing in the eyes of the beholder, nor in the arms of Morpheus reflecting that the juror could have been ensconced, so as to have stupefied the veniremen, or the sound discretion of the trial judge.

*Id.* at 659 (emphasis in original). The court went on to say in a footnote to the above:

> It is interesting to note that at oral argument counsel for the defense, nor anyone else recognized the significance or sagac-

ity of one of the Justice's inquiries as to whether the slumber of the jurors occurred during the case in chief or during the defense's examination, the answer to which was that the Van Winkle incident was appurtenant to the State's presentation, no credit to the State or prejudice to defendant.

*Id.* at 659 n. 2. This sagacity of the Utah appellate court seems to fit in our situation; i.e., "no credit to the State or prejudice to defendant." *Id.*

Finally, after the trial judge made the statement, the transcript shows no mistrial motion by appellant or even a request by appellant that the court remind the juror of his or her duties as a juror. It appears that the remark of the trial judge was simply a response to appellant's claim that the video was inflammatory—a hyperbole on the part of the trial judge.

## NOTE TAKING

█ Appellant objects to the taking of notes by the jury as authorized by the trial court, claiming an abuse of discretion or, in the alternative, the court erred in failing to give a cautionary instruction on note taking at the end of the trial. No such instruction was offered by appellant. This issue was raised for the first time on appeal, as in the cases of *Baum v. State,* 745 P.2d 877 (Wyo.1987); *Montez v. State,* 670 P.2d 694 (Wyo.1983); *Schuler v. State,* 668 P.2d 1333 (Wyo.1983); and *Haight v. State,* 654 P.2d 1232 (Wyo.1982).

Aside from this, there is no prejudice shown or fundamental right of appellant jeopardized. The taking of notes, generally, has been held to be discretionary. Abuse of discretion occurs when a court acts in a manner which exceeds the bounds of reason under the circumstances. *Wright v. State,* 707 P.2d 153 (Wyo.1985). Other courts in the United States have authorized the taking of notes. *People v. Ellinger,* 754 P.2d 396 (Colo.App.1987); *Howard v. State,* 583 P.2d 827 (Alaska 1978); *State v. Howard,* 224 Kan. 208, 579 P.2d 702 (1978).

In all respects, the trial was properly conducted, and the verdict was properly supported and is affirmed.