No. 01-585

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 319

STEVEN PORTER,

        Petitioner and Appellant,

   v.

STATE OF MONTANA,

        Respondent and Respondent.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                      In and for the County of Ravalli,
                      The Honorable Jeffrey H. Langton, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

                Jeffrey T. Renz, Kelly Lawson, School of Law, University of Montana,
        Missoula, Montana

        For Respondent:

                Mike McGrath, Montana Attorney General, John Paulson, Assistant
           Montana Attorney General, Helena, Montana; George J. Corn, Ravalli
    County Attorney, T. Geoffrey Mahar, Deputy Ravalli County Attorney,
        Hamilton, Montana

                              Submitted on Briefs:   April 11, 2002

                                        Decided:  December 19, 2002

Filed:

_____
                           Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      Appellant Steven Porter was convicted of criminal endangerment, a felony, in violation of § 45-5-207, MCA (1997), negligent endangerment, a misdemeanor, in violation of § 45-5-208, MCA (1997), and misdemeanor assault, in violation of § 45-5-201(1), MCA (1997), in the Twenty-First Judicial District Court, Ravalli County.  Porter filed a petition for post-conviction relief, in which he alleged that several errors resulted in his conviction, and that he received ineffective assistance of counsel.  The District Court granted Porter's petition with regard to his counsel's ineffective assistance for failure to file a notice of appeal, and allowed Porter ten days in which to file an appeal.  The District Court dismissed the remainder of Porter's claims.  Porter appeals his original conviction for criminal endangerment, as well as the District Court's dismissal of the remaining claims in his petition for post-conviction relief.  We affirm the judgment of the District Court.

¶2      We restate the issues on appeal as follows:

¶3      1.  Was there sufficient evidence to support Porter's conviction of criminal endangerment?
¶4
        2.  Was Porter denied his right to effective assistance of counsel by defense counsel's failure to move for a mistrial?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5      On July 18, 1998, Steven Porter traveled to the Slate Creek Campground, located 30 miles south of Darby, Montana, intending to camp there for the night.  Porter was accompanied by his brother, Jeff Porter (Jeff), Jeff's son J.C., and their friend Dustin

2

Willoughby. At the campground, Porter encountered Randy Hill (Randy) and his family. Porter and Randy were acquaintances, as both men worked for the Selway Corporation in Stevensville, Montana.

¶6 Porter, Jeff and Willoughby drank beer while at the campground, and by the evening of July 18, 1998, Porter was noticeably intoxicated. Randy returned to the campground and spoke with Porter, who was drinking beer and brandishing a rifle. At Porter's insistence, Randy examined the rifle and shot a round off into a tree. As the evening progressed, Porter and his friends continued to drink beer, and Porter grew increasingly loud and obnoxious. Porter eventually became upset over a disagreement he had with his brother Jeff. Porter tackled Jeff, and a physical fight ensued between the two men. Willoughby broke up the fight by putting Porter in a headlock. When Willoughby released Porter, Porter grabbed his rifle and a couple of beers and walked to the road, which traversed a nearby hill.

¶7 From his vantage point on the hill, Porter verbally taunted the other campers. Porter also directed specific threats at Willoughby. In an attempt to resolve the conflict, Willoughby went up to the road to speak with Porter. The two men sat down and began to talk. At some point during their conversation, Porter became angry with Willoughby, held up his rifle, and fired approximately five shots behind Willoughby's head. Willoughby stood up, and Porter hit Willoughby with the rifle in his face and lower back.

¶8 Willoughby returned to his campsite and warned the others campers that it was not safe for them to remain at the campground. Willoughby then hid in some nearby bushes. Porter reappeared at the campsite and spoke with Randy. Porter informed Randy that he had

shot rounds off near Willoughby's ear to scare him. Porter also told Randy that he could have killed any of the campers sitting around the campfire, as he had "beaded down" on them with his rifle. Randy understood the phrase "beaded down" to mean "take aim."

¶9 The Respondent, State of Montana, filed an information on August 19, 1998, charging Porter with two counts of felony assault, in violation of § 45-5-202(2), MCA (1997), misdemeanor assault, in violation of § 45-5-201(1), MCA (1997), and criminal endangerment, a felony, in violation of § 45-5-207, MCA (1997). Porter pled not guilty to all four charges on August 19, 1998. On November 10, 1998, the State filed an amended information, charging Porter with three counts of felony assault, in violation of § 45-5-202(2), MCA (1997), misdemeanor assault, in violation of § 45-5-201(1), MCA (1997), and two counts of criminal endangerment, a felony, in violation of § 45-5-207, MCA (1997). Porter pled not guilty to all charges in the amended information on November 25, 1998.

¶10 The case proceeded to jury trial on December 14, 1998. At the close of the State's case, Porter moved for a directed verdict on the three felony assault charges and the two criminal endangerment charges. The District Court granted Porter's motion with regard to the felony assault charges, but denied the motion with regard to the charges for criminal endangerment. Porter was convicted of one count of criminal endangerment, one count of negligent endangerment, and misdemeanor assault on December 17, 1998. Porter was sentenced by the District Court on February 16, 1999.

¶11 On February 7, 2000, Porter filed a petition for post-conviction relief. He later filed an amended petition for post-conviction relief on November 14, 2000. In his amended

4

petition, Porter alleged that numerous errors resulted in his conviction, and that he received ineffective assistance of counsel. The District Court conducted a hearing on Porter's petition on February 20, 2001. On July 2, 2001, the District Court issued an order, granting in part and denying in part Porter's requested relief. The District Court found that Porter received ineffective assistance of counsel, as Porter's counsel failed to appeal his conviction. Pursuant to Rule 5(c), M.R.App.P., the District Court granted Porter ten days in which to file an appeal. The District Court dismissed the remainder of Porter's petition. On July 9, 2001, Porter appealed his original conviction for criminal endangerment, as well as the District Court's dismissal of the remaining claims in his petition for post-conviction relief.

## STANDARD OF REVIEW

¶12 We review the sufficiency of evidence to support a jury verdict to determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Bauer*, 2002 MT 7, ¶ 15, 308 Mont. 99, ¶ 15, 39 P.3d 689, ¶ 15.

¶13 The correct standard of review of a district court's denial of a petition for post-conviction relief is whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Wright*, 2001 MT 282, ¶ 9, 307 Mont. 349, ¶ 9, 42 P.3d 753, ¶ 9. In this regard, we note that we have in the past articulated two different standards of review in cases addressing the denial of post-conviction relief, that standard noted above and most commonly applied, and the standard of "whether substantial evidence supports the findings and conclusions of the district court." *See State v. Moorman*

5

(1996), 279 Mont. 330, 335, 928 P.2d 145, 148; *Walker v. State* (1993), 261 Mont. 1, 6, 862 P.2d 1, 4; and *State v. Coates* (1990), 241 Mont. 331, 336, 786 P.2d 1182, 1185. This "substantial evidence for findings and conclusions" standard of review is incorrect and should no longer be cited as the standard of review in post-conviction relief cases. To the narrow extent that *Moorman, Walker*, *Coates*, and other "substantial evidence" cases have applied this incorrect standard of review, they are overruled.

**DISCUSSION**

**ISSUE 1**

¶14 **Was there sufficient evidence to support Porter's conviction of criminal endangerment?**

¶15 The elements of the offense of criminal endangerment are enumerated in § 45-5-207(1), MCA (1997), which provides, in pertinent part:

> A person who knowingly engages in conduct that creates a substantial risk of death or serious bodily injury to another commits the offense of criminal endangerment.

¶16 In *State v. Lambert* (1996), 280 Mont. 231, 929 P.2d 846, we considered the meaning of the term "knowingly," with regard to the offense of criminal endangerment, and concluded that "the 'knowingly' element of criminal endangerment contemplates a defendant's awareness of the high probability that the conduct in which he is engaging, whatever that conduct may be, will cause a substantial risk of death or serious bodily injury to another." *Lambert*, 280 Mont. at 237, 929 P.2d at 850. Porter contends that under the *Lambert* definition of "knowingly," the State failed to prove that he was aware of the high probability

6

that his conduct on July 18, 1998, would cause a substantial risk of death or serious bodily injury to other campers at the Slate Creek campground. In support of his contention, Porter cites an excerpt from Justice Leaphart's concurring opinion in *Lambert*, which applied the *Lambert* definition of "knowingly" to a fictional situation.

¶17   Justice Leaphart's fictional situation in *Lambert* contemplates three men standing in a field, each holding a rifle. *Lambert*, 280 Mont. at 242, 929 P.2d at 853. Jones fires in the direction of an open field. Smith fires in the direction of a grove of trees. Unbeknownst to Smith, a house sits in the grove of trees. Finally, Johnson fires in the direction of a cluster of houses, which sit before him in plain view. *Lambert*, 280 Mont. at 242, 929 P.2d at 853. Justice Leaphart concluded that each man was aware of his conduct, i.e., that he was shooting a rifle. However, under the *Lambert* definition of "knowingly," only Johnson would be guilty of criminal endangerment, as only Johnson's conduct resulted in a risk of harm of which he should have been aware. *Lambert*, 280 Mont. at 242, 929 P.2d at 853.

¶18   As testimony from the instant case indicates that Porter fired his rifle in the opposite direction of the campsite, Porter analogizes his situation to that of the fictitious Jones, whose conduct would not have amounted to criminal endangerment under the *Lambert* definition of "knowingly." However, the "facts" in Justice Leaphart's *Lambert* example are clearly distinguishable from those in the case at bar. The fictitious Jones fired his rifle in an open field, presumably while sober and during the daylight hours. Porter shot his rifle at nighttime, while angry and intoxicated. Further, the District Court found that Porter's discharge of the rifle was actually illegal, as § 61-8-369, MCA (1997), makes it a

7

misdemeanor to shoot any firearm from or across the right-of-way of any state or federal highway or county road. Since Porter was either on or near a county road when he shot his rifle, his conduct was illegal. Therefore, because Porter shot his rifle at nighttime, while angry and intoxicated, from a county road adjacent to an occupied public campground, his situation is not analogous to that of the fictitious Jones.

¶19 Porter further asserts that under the *Lambert* definition of "knowingly," insufficient evidence existed to prove that he was aware of the high probability that his conduct would cause a substantial risk of death or serious bodily injury to other campers at the Slate Creek campground. More specifically, Porter maintains that there was insufficient evidence to prove that the safety was off on his rifle, or that Porter's finger was on the trigger, when he "beaded down" on the other campers from his vantage point on the hill. As we stated above, the standard of review for challenges to the sufficiency of evidence supporting a conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Bauer*, ¶ 15. This Court noted in *State v. Brown* (1989), 239 Mont. 453, 457, 781 P.2d 281, 284, that this familiar standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."

¶20 The criminal endangerment charge upon which Porter was convicted pertained to his conduct regarding Randy Hill and his family. The jury heard testimony at trial from both Randy and his wife Joyce Hill. Randy and Joyce were at the campsite when Porter and his

8

brother Jeff engaged in a physical fight. They were both aware that Porter was drunk and in possession of a rifle. Joyce testified that she was frightened by Porter's behavior, and had pleaded with Willoughby not to go up the hill to speak with Porter. Randy, Joyce, and the other campers heard approximately five gunshots, and watched as Willoughby returned to the campsite with wounds on his face and lower back. Randy testified that Porter later reappeared at the campsite and told him that he had "beaded down" on all of the people around the campfire with his rifle. Randy further testified that he understood the phrase "beaded down" to mean "take aim." Randy also informed the jury that Porter's statement had frightened him, and that he was unable to sleep until after police officers arrived at the campground.

¶21 At the close of the State's case, Porter moved for a directed verdict on the criminal endangerment charges against him. The District Court denied this motion, noting with regard to Porter's statement to Randy Hill: "If you give credence to the statement, then [Porter] was just a trigger finger away from possibly killing someone or at least a trigger pull away, and he was dead drunk at the time." As such, the District Court found that Porter's conduct, of "beading" his rifle on human targets, while intoxicated and angry, and after prior reckless firing, constituted sufficient evidence of the crime of criminal endangerment to present a jury question.

¶22 Despite the District Court's conclusion, Porter contends that because the State did not prove that the safety was off on his rifle, or that Porter's finger was actually on the trigger when he "beaded down" on the campers, a reasonable jury could not have found that there

9

was sufficient evidence to support a conviction of criminal endangerment. We disagree. Although the State may not have specifically proven the above facts, it was certainly possible for the jury to infer them. Porter sat on the hill and discharged his rifle approximately five times while Randy, Joyce, and the other campers sat at the campsite below. It was therefore not unreasonable for the jury to assume that Porter was capable of discharging that same rifle when he "beaded down" on the campers moments later. Moreover, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact. Section 26-1-301, MCA. Randy testified that Porter admitted he had "beaded down" on all of the campers sitting around the campfire with his rifle. We hold that sufficient evidence existed upon which a rational trier of fact could have found that Porter was aware of the high probability that his conduct would cause a substantial risk of death or serious bodily injury to Randy Hill and his family on July 18, 1998. Accordingly, the District Court did not err in denying Porter's motion for a directed verdict.

## ISSUE 2

¶23 **Was Porter denied his right to effective assistance of counsel by defense counsel's failure to move for a mistrial?**

¶24 In his amended petition for post-conviction relief, Porter alleged that he was denied his right to effective assistance of counsel. Specifically, Porter contended that because members of the prospective jury witnessed him in handcuffs, leg irons, and waist shackles, his attorney should have moved for a mistrial. The District Court found defense counsel's

10

failure to move for a mistrial in response to these circumstances to be harmless error, and dismissed Porter's claim. Porter appeals the District Court's dismissal of his petition for post-conviction relief with regard to this issue.

¶25 In rejecting Porter's claim, the District Court noted that despite Porter's contention that the jury witnessed him in waist shackles and leg irons, no witnesses or affidavits were offered to substantiate Porter's claim. In fact, three of the four jurors who testified at the hearing on Porter's petition for post-conviction relief had no recollection of Porter appearing before them in waist shackles or leg irons, and the fourth juror was uncertain. On the basis of this testimony, the District Court found that Porter was restrained only by handcuffs during his appearance before the jury panel. Accordingly, handcuffs are the sole form of restraint we will consider in evaluating this issue.

¶26 In *State v. Hagen*, 2002 MT 190, ¶ 17, 311 Mont. 117, ¶ 17, 53 P.3d 885, ¶ 17, we noted that "a petitioner seeking to reverse a district court's denial of a petition for postconviction relief based on a claim of ineffective assistance of counsel bears a heavy burden." To assess a claim of ineffective assistance of counsel, both on direct appeal and in post-conviction proceedings, this Court applies the two-prong test from *Strickland v. Washington* (1984), 446 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. The *Strickland* test requires the defendant to "show that his counsel's performance was deficient and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial." *Dawson v. State*, 2000 MT 219, ¶ 20, 301 Mont. 135, ¶ 20, 10 P.3d 49, ¶ 20. This Court has further noted that: "Pursuant to *Strickland*, a defendant alleging ineffective assistance of

11

counsel must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Dawson*, ¶ 20.

¶27 At the hearing on Porter's petition for post-conviction relief, defense counsel testified that Porter was in handcuffs when he entered the courtroom. He further testified that no other restraining devices were placed on Porter. Defense counsel testified that he requested the handcuffs be removed from Porter's wrists, and that his request was promptly granted. Finally, defense counsel noted that although prospective jurors *may have been* in the courtroom when Porter initially entered in handcuffs, Porter's handcuffs were removed before the jury was seated in the jury box. When questioned about his failure to move for a mistrial in response to the jury's possible observation of Porter in restraints, defense counsel stated that "the outcome of the cases that I had seen is there was no prejudice to be found [in] be[ing] seated in front of a jury wearing handcuffs."

¶28 Porter asserts that defense counsel's failure to move for a mistrial stemmed from ignorance rather than informed, professional deliberation, as the jury's observation of him in restraints was inherently prejudicial. We disagree. This Court addressed a similar situation in *State v. Baugh* (1977), 174 Mont. 456, 571 P.2d 779. In *Baugh*, the defendant was escorted to trial in handcuffs, which were then unlocked in front of the jury before the trial commenced. *Baugh*, 174 Mont. at 458, 571 P.2d at 780. Despite the jury's obvious observation of the defendant in restraints, we noted that the "right to be free of shackles during trial need not be extended to the right to be free of shackles while being taken back

and forth between the courthouse and the jail." *Baugh*, 174 Mont. at 462-63, 571 P.2d at 782-83. This Court concluded that the defendant in *Baugh* was not prejudiced by the jury's view of him in handcuffs, as "a defendant is not denied a fair trial and is not entitled to a mistrial solely because he was momentarily and inadvertently seen in handcuffs by jury members." *Baugh*, 174 Mont. at 463, 571 P.2d at 783.

¶29 The above holding from *Baugh* was echoed by this Court in both *State v. Pendergrass* (1980), 189 Mont. 127, 615 P.2d 201; and *State v. Schatz* (1981), 194 Mont. 59, 634 P.2d 1193. In *Pendergrass*, the defendant asserted that the jury's observation of him in handcuffs prior to the commencement of trial affected the presumption of innocence he should have been afforded. *Pendergrass*, 189 Mont. at 133, 615 P.2d at 205. We determined that the jury's view of the defendant in restraints was momentary and inadvertent, stating: "In the absence of an indication of prejudicial consequences, such an occurrence does not warrant the granting of a new trial." *Pendergrass*, 189 Mont. at 134, 615 P.2d at 205. In *Schatz*, the defendant was seen in handcuffs by members of the jury while being transported from the courtroom back to confinement. *Schatz*, 194 Mont. at 63, 634 P.2d at 1196. This Court relied upon the holding in *Baugh* and again concluded that "there was no showing of prejudice to the defendant resulting from the momentary viewing." *Schatz*, 194 Mont. at 63, 634 P.2d at 1196.

¶30 Despite our previous holdings in *Baugh*, *Pendergrass*, and *Schatz*, Porter invites this Court to adopt the reasoning of *Rhoden v. Rowland* (9th Cir. 1999), 172 F.3d 633. In *Rhoden*, the Ninth Circuit Court of Appeals concluded that habeas relief was warranted when a

13

defendant's shackling in the courtroom was visible to the jurors.  *Rhoden*, 172 F.3d at 636.  The *Rhoden* Court held that the defendant's shackling *during trial* amounted to a denial of his due process rights, as the shackles had a "substantial and injurious effect or influence in determining the jury's verdict, and thus did not constitute harmless error." *Rhoden*, 172 P.3d at 637.

¶31     *Rhoden* is distinguishable from the instant case.  In *Rhoden*, the defendant was shackled for the duration of his trial.  Porter wore handcuffs for only moments in front of a group of potential jurors, and never again appeared before the jury in restraints.  Furthermore, the *Rhoden* Court noted that when a defendant's shackling was not actually observed by the jury during trial, such shackling amounted to harmless error.  *Rhoden*, 172 P.3d at 636.

¶32     Under the facts presented here, and pursuant to our holdings in *Baugh*, *Pendergrass*, and *Schatz*, we conclude that Porter has failed to establish any prejudice as a result of the momentary observation of him in handcuffs by prospective jurors prior to the commencement of trial.  Thus, the failure of Porter's attorney to move for a mistrial did not constitute ineffective assistance of counsel.

¶33     For the foregoing reasons, the judgment of the District Court is affirmed.


                                                    /S/ PATRICIA COTTER


We Concur:


14

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

Justice Terry N. Trieweiler specially concurs.

¶34 I concur with the majority's conclusion that if the defendant, Steven Porter, pointed a loaded rifle at people after consumption of a substantial amount of alcohol and had the capability of discharging it, he knowingly engaged in conduct that created a substantial risk of death or serious bodily injury to others in violation of § 45-5-207(1), MCA (1997). I also concur that, based on the evidence and reasonable inferences that could be drawn from the evidence, the State has proven the bare minimum necessary to establish those facts.

¶35 However, I do not agree with all that is said in the majority Opinion and think it is important to point out what this case is not about.

¶36 The issue raised by Porter on appeal is simply whether there was sufficient evidence for the jury to infer that he created a substantial risk of death or serious bodily injury to Randy and Joyce Hill and their children by pointing his rifle at them when, according to him, there was no evidence that the safety mechanism had been released or that he had his finger on the trigger. I agree that, based on his general behavior, his previous altercations, and his prior repeated discharge of his weapon, the jury could infer that the safety mechanism had been released and that he pointed the rifle at the Hill family with the capability of discharging it.

¶37 However, Porter did not commit criminal endangerment when he previously discharged his weapon and the distinctions between his conduct when he discharged his weapon and the examples in Justice Leaphart's concurring Opinion in *State v. Lambert* (1996), 280 Mont. 231, 929 P.2d 846, are both misleading and irrelevant.

16

¶38     The majority Opinion makes a distinction between the innocent behavior described in Justice Leaphart's example and Porter's conduct by stating that Porter shot his rifle at night time while angry and intoxicated and that the discharge was illegal, in violation of § 61-8-369, MCA (1997), because Porter was either on or near the county road when he shot his rifle.  I disagree that there is any distinction between Porter's conduct and the innocent conduct described in Justice Leaphart's Opinion that is relevant to the criminal endangerment statute or that Porter's discharge of his weapon was the basis, or could have been the basis for, his criminal endangerment of the Hill family.  All of the evidence was that Porter discharged his weapon away from the campground.  More importantly, Porter's discharge of his weapon was not the basis for his conviction.  That is clear from the colloquy engaged in among counsel and the District Court while counsel's motion for judgment as a matter of law was argued.  For example, when counsel for Porter pointed out that there was no evidence that Porter ever fired his rifle toward the Hill family, the court stated:

> The Court: Actually, no, it was–it was being fired the opposite way.
>
> . . . .
>
> The only testimony before the court is that the gun was fired the opposite direction from the campers, and Willoughby was very clear about that, and there's no physical evidence to contradict that.  And there's no evidence of the campers or anybody being on that side of the road, and the list of victims were all on this side of the road, so there's no evidence that the shots that he fired– this is a matter of physical reality.  He could have endangered the campers, right.

¶39     The District Court recognized that it was not the discharge of his weapon which endangered anyone but the fact that he told Randy Hill that he pointed the weapon at them.

17

The court stated:

> I think you may have a jury question there, if not for shooting, but if–because the only evidence was he didn't shoot anywhere near the camp. And for the testimony to have things laid out, he'd have to sort of had to ricochet off of a satellite to get back to where the people were. But I guess if he did in fact–if there was testimony that he said that he was sighting in on people, under those circumstances, then I think you've got a jury question, so maybe we need to look at that portion of Hill's testimony.
>
> . . . .
>
> I guess that my inclination at this point is to dismiss the assault charges and proceed with the endangerment charges. I think at least there's some jury questions there. I think there may not be if he hadn't made that statement about beading down on them, and I'm not sure that he limited who he said he beaded down on.
>
> The sad fact is that that was probably a lot of hype. Since it was in the middle of the night, maybe there was some people who thought he fired below. I'm not sure how much he can bead in the middle of the night by the campfire light, but by saying that, it's the best evidence of what he was doing up there.

¶40    It is clear from the evidence and from the District Court's characterization of the evidence when it was asked to decide whether there was sufficient evidence to support the charge of criminal endangerment for which Porter was convicted, that the conviction was based completely on Porter's drunken braggadocio. It was based upon Porter's statement that he pointed his rifle at campers in the middle of the night after substantial consumption of alcoholic beverages and after repeated prior discharge of his rifle. However, the prior discharge of his rifle did not form the basis for Porter's conviction of criminal endangerment and the majority's discussion at ¶¶ 16 and 17 simply confuses the issue in this case and our prior holding in *Lambert*.

¶41    Finally, after reviewing the testimony of the jurors who were called as witnesses

18

regarding Porter's appearance in the courtroom while wearing handcuffs or chains, I agree that prejudice has not been established. However, prejudice is practically impossible to establish. No juror is going to admit, after finding a defendant guilty of committing a felony which endangered others, that his or her verdict was influenced by the defendant's appearance in the courtroom in handcuffs or chains. It is evident from our precedent and the prior cases of the 9th Circuit Court of Appeals that the resolution in each case is heavily dependent on its own facts. Because the result is never a forgone conclusion, it is important that law enforcement and prosecutors not jeopardize future convictions by carelessly bringing defendants in front of a jury, even briefly, while wearing handcuffs, leg irons, or other security devices which infer that the defendant is a dangerous individual, absent compelling security reasons. The standard under these circumstances is anything but clear, and the best policy would be to avoid the necessity of this issue being raised in the future.

¶42 For these reasons, I specially concur in the majority Opinion.

/S/ TERRY N. TRIEWEILER

19