NO. 93-200

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

ALTON EUGENE WALKER,

       Petitioner and Appellant,

-vs-

STATE OF MONTANA,

       Respondent and Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Maurice R. Colberg, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

       Alton Eugene Walker, Pro Se, Deer Lodge, Montana

       For Respondent:

       Joseph P. Mazurek, Attorney General, Elizabeth L.
Griffing, Ass't Attorney General, Helena, Montana
Dennis Paxinos, Yellowstone County Attorney,
Billings, Montana

FILED

SEP 28 1993

Ed Smith

Filed: OF SUPREME COURT
STATE OF MONTANA

Submitted on Briefs: August 26, 1993

Decided: September 28, 1993

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from the Thirteenth Judicial District Court, Yellowstone County, denying Alton Eugene Walker's (Walker) petition for post-conviction relief. Walker appeals from the District Court's denial of his petition. We affirm.

One issue is dispositive of this appeal: whether the District Court erred in denying Walker's petition for post-conviction relief.

On June 30, 1988, Walker was charged with felony assault and aggravated assault. At that time, Walker retained John Adams as his attorney. Walker pled not guilty and was released on bond. Walker subsequently fled the jurisdiction of the state; a bench warrant was issued and his bond was forfeited.

On March 7, 1989, Walker was apprehended and returned to Montana. On April 24, 1989, Walker retained Dennis Paxinos as co-counsel for the purposes of his trial, which was scheduled for June 5, 1989.

After the jury trial concluded, Walker was found guilty of both the assault charges and, on July 13, 1989, was sentenced to ten years on the felony assault charge and twenty years on the aggravated assault charge. Walker then moved pro se for a new trial and filed a petition for a writ of habeas corpus and a motion for a "Bill of Particulars." Both motions were denied by the District Court. Walker did not appeal the conviction itself, nor did he appeal the denial of his motions.

Walker was sent to the Montana State Prison and then

extradited to Ohio on September 15, 1989, to stand trial for a pending charge of aggravated murder. Be was found guilty of the murder charge, sentenced to life imprisonment, and returned to Montana to serve his assault sentences. Ohio currently has a detainer placed on Walker.

On March 29, 1990, Walker filed a "Petition for Writ of Certiorari and Application for an Extension of Time to File an Appellant's Brief," requesting leave to file a delayed appeal. This Court denied that petition, and disallowed the untimely appeal.

On February 13, 1991, Walker filed a "Petition for Coram Nobis, etc., Motion to Vacate[,] Set Aside[,] or Correct Judgment" in state district court. On March 7, 1991, Walker filed a "Motion to Amend and Add to Previous Petition of Writ of Coram Nobis." Among other claims for relief, Walker charged that his attorneys provided him with ineffective assistance of counsel. Because of this allegation, the District Court ordered the attorneys, John Adams and Dennis Paxinos, to respond to the charges. After their affidavits were filed, the State of Montana (State) moved to dismiss the petition. The District Court treated the petition as a petition for post-conviction relief, and dismissed all the claims except those regarding ineffective assistance of counsel. Walker has not appealed from the dismissal of these claims. Walker has, however, filed numerous petitions with this Court during the pendency of the District Court proceedings.

The District Court ordered an evidentiary hearing on the claims of ineffective assistance of counsel and appointed Walker

3

new defense counsel. The hearing was held on August 7, 1992. On February 25, 1993, the District Court issued its Findings of Fact, Conclusions of Law and Order denying the petition for post-conviction relief. From this judgement, Walker appeals.

The factual background leading up to Walker's conviction is as follows. Walker lived in Billings in a house with the victim, D.T., Beverly Martin (Martin), Donna Carl, and two children. D.T. had lived with Walker for approximately ten years and worked for him as a prostitute, as did the other women, in Billings and Butte.

In the early morning hours of June 21, 1988, D.T. and Martin returned from Butte where they had been working. Around 3:30 a.m., Walker and the women began smoking cocaine, continuing until 9:00 a.m. About that time, Walker became angry with D.T. and began hitting her, concentrating on the face and head. Walker threw drinking glasses at D.T. and hit her with heavy ashtrays, his fists, a belt and belt buckle, a flyswatter, and a telephone. He also broke one of her fingers. In addition, he re-opened a previous wound on her scalp and attempted to strangle her. This abuse went on for most of the day, with Walker starting and stopping the beating. Finally, Walker ordered D.T. to clean up the blood which had splattered on the walls and bed. As she was doing so, Walker pulled a "metal bar" (later identified as a shotgun) out of the closet and struck D.T. in the head with the barrel, opening a large wound on her forehead. Because the bleeding would not stop, Walker ordered Martin to take D.T. to the hospital.

D.T. was treated at the hospital for multiple lacerations on her face, head, and scalp. Glass was imbedded in the cuts, and she

4

had bruising around her neck. In addition, one of her fingers was broken. At this time, there was no indication of bruising on her arms, chest, or abdomen. D.T. was afraid to tell the hospital personnel what had happened, in fear of Walker's retaliation.

When D.T. left the hospital, around 6:00 a.m. on June 22, 1988, Walker was waiting for her. D.T. felt she had no choice but to return to the house. Upon arriving at the house, D.T. attempted to sleep but Walker kept waking her up. At 11:00 a.m., he ordered her into the living room, where he removed her clothing. He then began punching her on her chest, stomach, and arms. He also jumped on her with his knees, and stomped on her with his feet. When D.T. put up her hands to protect herself, Walker crushed a joint in her finger and broke another finger. He again threw ashtrays and drinking glasses at her and burned her face with a small torch. In addition, he punched out her front teeth and crushed her ribs. Walker would stop the beating, and then resume again. Finally, Walker threw a glass at D.T. which caused a severe cut to her forearm. The wound was bleeding severely and could not be stopped: Walker again told Martin to take D.T. to the hospital.

Martin and D.T. drove around the hospital, checking to see if Walker had followed them. Then, Martin told D.T. she would help her get away. Around 4:30 p.m., D.T. was driven to a pay phone, where she called a taxi. When the taxi arrived, D.T. climbed in the back seat and laid down, afraid Walker would see her. D.T. decided to go to Red Lodge, believing that Walker would not look for her there.

During the taxi ride, D.T. told the taxi driver, Norman

5

Jensen, that her boyfriend had beaten her up, and told him about the earlier assault. Mr. Jensen drove D.T. to the hospital in Red Lodge, and Dr. Kerr, the emergency room physician at the Red Lodge hospital, treated D.T. upon her arrival. Dr. Kerr testified that the injuries D.T. had suffered were the worst beatings he had ever seen during his tenure as a physician. D.T. had bruises all over her face, neck, chest, abdomen, and back and lacerations on the front and back of her head. She was missing a tooth and had lacerations to the lip. In addition, two fingers were fractured and two ribs were broken, and she had a deep cut in her forearm. Dr. Kerr considered D.T.'s condition severe and possibly life-threatening. D.T. eventually had reconstructive surgery on her hands. D.T. was unable to feed herself for three weeks, was unable to eat solid meals for three months, and was unable to bathe or dress herself for six months.

After Dr. Kerr treated D.T., he contacted a social worker, Ed Lambrect, who interviewed D.T. at the hospital. D.T. was initially reluctant to identify and accuse Walker, but after Mr. Lambrect told D.T. that Dr. Kerr had to report the assault to the police, D.T. told Mr. Lambrect that she had been beaten by Walker, taken to a Billings hospital, then taken home and beaten again.

Meanwhile, the Billings police went to Walker's house to investigate a report by the Department of Family Services regarding the children at the residence. An officer spoke with Walker and stated he was looking for Danny Sessions. Walker stated he knew Sessions but that Sessions was not at the house. An officer also asked Walker if he knew D.T., and Walker said that he did not know

6

her very well and that he had not seen her for some time. Walker then left the house and walked away. The officer later learned that the name Walker was an alias used by Danny Sessions.

After D.T. spoke with the police regarding the assaults, the police returned to Walker's house with a warrant, and found Walker hiding in a closet. Walker was placed under arrest and read his <u>Miranda</u> rights. Walker admitted that he had "done the first beating" but not the second one. At this time, the police had not even told Walker about the second assault.

The police also searched the house for items D.T. claimed she had been beaten with, including a "metal bar", a pipe, glasses and ashtrays. The police found broken glass scattered around the house and found blood on the bed, walls, and ceilings. They also found broken glass imbedded in a wall, and found broken ashtrays, broken glass, and pieces of a flyswatter in the garbage can. The police did not find a "metal bar," but did find a shotgun in the closet.

Walker did not present any evidence at trial. Based upon the facts previously discussed, a jury found Walker guilty of felony assault for the first beating and aggravated assault for the second beating.

The standard of review for denial of post-conviction relief is whether substantial evidence supports the findings and conclusions of the district court. State v. Coates (1990), 241 Mont. 331, 336, 786 P.2d 1182, 1185. Walker argues that the District Court erred in failing to find he was provided with ineffective assistance of counsel. We disagree.

There is a heavy burden of proof on a defendant who seeks to

7

reverse a judgment on the grounds of ineffective assistance of counsel. State v. McColley (1991), 247 Mont. 524, 526, 807 P.2d 1358, 1360. In evaluating ineffective assistance of counsel claims, we utilize a two-part test as set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. First, the defendant must establish that counsel's performance was deficient. Coates, 786 P.2d at 1185. Counsel's performance will be evaluated pursuant to the "reasonably effective assistance" test: if counsel acted within the range of competence demanded of attorneys in criminal cases, his performance was not deficient. Coates, 786 P.2d at 1185.

To satisfy the second prong of the Strickland test, the defendant must establish that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Coates, 786 P.2d at 1185. The standard for evaluating prejudice is whether a reasonable probability exists that, but for counsel's deficient performance, the trial's outcome would have been different. Coates, 786 P.2d at 1185. However, this Court will not second-guess trial tactics and strategy. Coates, 786 P.2d at 1185.

In his petition for post-conviction relief, Walker alleges that the following errors were committed by Mr. Paxinos and Mr. Adams:

1.    Counsel failed to introduce evidence to rebut D.T.'s claim that Walker had beaten her with a "metal bar" (or shotgun):

2.    Counsel failed to introduce eye-witness testimony to the beatings: and

3.    Counsel failed to file a notice of appeal.

8

I - THE METAL BAR/SHOTGUN ISSUE

Walker contends that counsel was ineffective by failing to introduce evidence rebutting D.T.'s testimony that Walker hit her with a shotgun, by not having the shotgun tested for trace evidence, and by not calling any experts to testify as to the exact cause of the wounds to D.T.'s forehead.

Mr. Paxinos exhaustively cross-examined D.T. on this issue, and elicited the admission from D.T. that she had originally told hospital personnel that she had been hit with a metal bar. Mr. Paxinos cross-examined Mr. Lambrect, the social worker, who also testified that D.T. told him she had been hit with a metal bar. Mr. Paxinos elicited this testimony from the police officer who initially interviewed D.T. Mr. Paxinos repeatedly attempted to impeach the credibility of D.T. by emphasizing the fact that D.T. had initially reported that she had been hit with a metal bar. In addition, Mr. Paxinos moved for a directed verdict on this issue because of the discrepancy between the information originally reported by D.T. and the testimony elicited at trial.

Walker has established nothing that indicates that either counsel fell below the standard of reasonably effective assistance on this issue. On the contrary, the record contains substantial evidence that Mr. Paxinos thoroughly addressed this matter, both on cross-examination and by moving for a directed verdict. Given the fact that the barrel of a shotgun is a metal bar, we fail to see how counsel could have made more of this issue than he did.

In addition, Walker contends that counsel was ineffective because they failed to have the shotgun tested for trace evidence

9

and failed to call any experts to testify as to the exact cause of the wounds to D.T.'s forehead. These specific claims of ineffective assistance of counsel were not raised by Walker in his petition or during the hearing. Therefore, because Walker failed to raise these claims in the District Court, we will not address them for the first time on appeal.

II - EYEWITNESS TESTIMONY

Walker also contends that counsel failed to introduce eye-witness testimony to the beatings, and that this failure amounts to ineffective assistance of counsel. The record shows that counsel interviewed all possible eyewitnesses and decided that their testimony was not credible. For example, in the middle of the trial, Martin tried to take the blame for the beatings. Counsel discussed her statements with Walker, who agreed she should not testify. Counsel further made the record in chambers that they could not present Martin's new story for fear of suborning perjury.

In addition, the record clearly indicates that Walker did not want anyone to testify on his behalf. The following discussion, which took place in chambers, is illustrative:

> [By Mr. Adams]: I would like to put on the record the fact that the state having rested, it is the intent of the defendant to rest at this time. . . Mr. Walker has indicated to us that he does not wish to testify at this time, does not wish to offer any evidence in regard to this matter, but we want it understood that he was advised that he can if he wishes. . . Mr. Walker is that what we talked to you [about]?

> [By Walker]: Yes, it is.

> ' ' '

> [By Mr. Paxinos]: Is it also true that we have discussed with you the fact that you had certain alleged alibi

10

witnesses or witnesses that I could not --

[By Walker]: This is true. I don't want her to testify, so we will just, we don't want anybody else to get in trouble.

[By Mr. Paxinos]: We don't want anybody else on the witness stand; is that right?

[By Walker]: That's right.

' . .

[By Mr. Paxinos]: One clarification. You don't want McNeil to testify either, is that correct?

[By Walker]: Well, at this point I don't see any light anywhere. . . .

Walker has not made any showing that counsel's performance was deficient on this issue. Counsel was prepared for trial and properly questioned witnesses and investigated all viable leads. Counsel filed pretrial motions and attempted to negotiate a favorable plea bargain. Counsel rigorously represented Walker at trial, thoroughly cross-examined all witnesses, and moved for a directed verdict. The evidence against Walker was overwhelming: besides the convincing testimony of the victim, Mr. Jensen, Dr. Kerr, and Mr. Lambrect, the State offered evidence that Walker had misinformed police officers of his identity, presented tacit admissions by Walker, and introduced evidence that Walker was hiding from the police and had absconded from the jurisdiction of the State after making bail. Walker has not established that counsel fell below the standard of reasonably effective assistance on this issue.

III - APPEAL ISSUE

Walker contends that he was denied effective assistance of

11

appellate counsel, because his attorneys did not file a notice of appeal. The record indicates that Mr. Adams and Mr. Paxinos met with Walker and informed Walker of his right to appeal. Counsel informed Walker that they did not believe any meritorious issues for appeal existed. After sentencing, Mr. Paxinos was dismissed by Walker. Mr. Adams advised Walker to pursue sentence review remedies. In addition, Walker never requested either counsel to file a notice of appeal. There is no basis for a claim of ineffective assistance of counsel based on a failure to appeal if the defendant does not express his desire to appeal to counsel. In Re Petition of David Allen **Melone,** Order of the Montana Supreme Court dated August 4, 1992, Cause No. 92-162.

The District Court found that Walker had been advised of his right to appeal, but did not communicate any desire to appeal to his counsel. In fact, the record shows that Walker wished to file a motion for a new trial, and drafted such a motion, as well as other petitions and motions, himself. The testimony of Mr. Paxinos and Mr. Adams, as well as Walker's own actions, provide substantial evidence for the District Court's finding that Walker was not deprived of effective appellate counsel.

In conclusion, there is substantial evidence in the record to support the District Court's findings and conclusions that Walker was provided with both effective trial and appellate counsel, and that another attorney would not have obtained a more favorable result for Walker considering the amount of evidence the State presented against Walker. Walker has failed to establish that counsel's performance was deficient or that any of their alleged

12

errors prejudiced the outcome of the trial.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

13