No.   93-086

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

---

STATE OF MONTANA,

        Plaintiff and Respondent,

   -v-

DONALD BARRACK,

        Defendant and Appellant.

FILED

OCT 1 a 1994

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

---

APPEAL FROM:   District Court of the Fourth Judicial District,
               In and for the County of Missoula,
               The Honorable Ed P. McLean, Judge presiding.


COUNSEL OF RECORD.:

        For Appellant:

               J. Dirk Beccari and Marcia M. Jacobson, Public
               Defender Office, Missoula, Montana

        For Respondent:

               Hon. Joseph P. Mazurek, Attorney General, Carol
               Schmidt, Assistant Attorney General: Robert L.
               Deschamps, III, Missoula County Attorney, Fred Van
               Valkenburg, Deputy Missoula County Attorney

---

                        Submitted on Briefs:  July 6, 1994

                              Decided:  October 13, 1994

Filed:

_____
                  Clerk

Justice James C. Nelson delivered the Opinion of the Court.

This is an appeal from a Fourth Judicial District Court, Missoula County, jury verdict finding Donald Barrack, guilty of aggravated assault, and from the accompanying judgment filed on August 21, 1992. We affirm.

The following are issues on appeal:

I. Did the District Court err in treating Barrack's motion for a new trial as a petition for post-conviction relief under a writ of coram nobis?

II. Did the District Court err when it denied Barrack's motion for a new trial based upon insufficient evidence to support the jury verdict?

III. Did the District Court err when it denied Barrack's motion for a new trial based upon his "excusable mistake" in failing to subpoena hospital records containing the victim's blood alcohol content?

## FACTUAL BACKGROUND

The defendant/appellant, Donald Barrack (Barrack), was living in a trailer at 4625 Graham, Westview Trailer Court in Missoula, Montana, with Robert Cole (Cole), whom Barrack worked with at the Mahlum Ace Hardware Store in Missoula. Robert Cole owned the trailer with his wife, Joan Cole (Joan), from whom he had separated in August of 1991. Joan and Cole decided to sell the trailer during January and February of 1992, and they were able to find a buyer. The buyer wanted to move into the trailer within a week of closing.

2

This was a problem because Barrack was still living in the trailer. Cole also still lived there "on and off" but he spent a great deal of time at the home of Sue Llewellyn (Sue), who was his fiancee. At the time of the sale of the trailer, he was in the process of moving into her home.

Joan and Cole met with Barrack on February 13, 1992, to inform him that the trailer had been sold and he would have to vacate the trailer in a very short time. Cole and Barrack "finally worked it out," ending their negotiations with a signed note stating that Barrack would vacate the trailer around February 20. They then went to two taverns in town, spent about two hours together and drank a few beers. Barrack left the second tavern, Mulligan's, but Cole stayed with another friend and continued drinking.

At some point later in the evening, Cole and his friend, Marty, went to a tavern in Marty's neighborhood. A fight started at the neighborhood tavern, the police were called to end the altercation, and they took Cole and Marty to Marty's house because the two men were not able to drive. When Cole arrived at Marty's house, he called Sue to come and get him. Sue arrived at Marty's house, retrieved Cole and as they were driving to Sue's house, they started to discuss whether Barrack had left the trailer. Sue wanted to make sure that Barrack was either packing or had moved out so she drove to the trailer.

Testimony after that point in time is contradictory. Cole testified that when they arrived at the trailer, they went to the front door, knocked loudly, heard no answer, went to the back door,

3

knocked, heard no answer, and tried the front door one more time. The two went to the car, discussed the issue for a while, Cole tired of the discussion, and he walked away. Cole also testified that while the two were going from door to door, they were yelling, screaming and making loud noises. He further testified that the porch light and a yard light were on, as well as a light under the hood of the stove in the kitchen.

Cole stated that when he walked away, Sue got back in the car, pulled out of the driveway, stopped and pulled back into the driveway. He decided to return to the car, walked back to where it was parked and as he came around the car, he saw Barrack standing near the car, holding a gun and Sue laying by the car.

Sue testified that she was taking care of Cole and Joan's child on the evening of February 13, 1992, because Cole was out celebrating his friend, Marty's birthday. She stated that he called her from Marty's house later in the evening for a ride and they discussed the situation with Barrack and the trailer as she was driving. She testified that they drove to the trailer, both walked to the front door, knocked hard, received no answer, went to the back door to knock, and then returned to the front door. She testified that she was yelling at Cole at the time and there were outside lights on but none inside as far as she could see. After they received no response, the two walked back to the car, continued to fight and then Cole started to walk away.

Sue got in the car in an attempt to follow him, changed her mind, turned the car off, and went back to the front door. The

4

door was locked so she kicked the door as hard as she could. On the third try, she kicked the door open, took a step inside the door, then she saw a flash, and felt a bullet enter her chest.

Mike Davenport, a trailer park neighbor, testified that at about 10:15 or 10:20 on the evening in question, he heard a loud banging and noise. He went to his door and looked outside in the direction of the pounding. He saw a woman hollering, screaming and pounding on the door. He said he could not see any lights on at the house nor was there a light on the porch. He stated that he could just see one person, a woman, pounding on the door and yelling. She could not get inside so she returned to the car, and tried to get the person in the car to help her get into the trailer. She had a fight with the person in the car until the other person left and started walking down the street. Davenport then saw the woman get into the driver's side of the car, start the engine, start to leave, pause and return to the trailer. At that point, he went to get dressed, and while he was returning to where he had been watching the events of the night, he heard a loud, high-pitched crack. He testified that when he got to the door, he looked out and saw the woman walking, leaning over a bit, to the rear of her car. She was looking up the street toward where the person who left the car had walked and ultimately, she collapsed. At that point, Mike Davenport called 911 and reported the incident.

Barrack testified that he discussed the move from the trailer on February 13, 1992, with Cole and Joan. After Joan left, Cole and Barrack came to an agreement that Barrack would move to another

5

place within a week.  At a later point in time, the two men went to a tavern called Joker's Wild for a few beers.  The two then met with Cole's friend, Marty, to celebrate Marty's birthday and the three drank beer at a tavern called Mulligan's.  Barrack left that tavern after drinking.1 1/2 beers, ordered some takeout food from a restaurant, went home, ate, watched television and went to sleep. He stated that he went to bed around 8:30 to 9:00.

Barrack further testified that he had been asleep for some time when he thought he heard knocking at the back door, "more of a feeling of something striking the trailer than I had heard, but I thought I heard a knock," and he went to the back door. He further reported that he did not put on his glasses because he was not sure that he had heard or felt something, he thought perhaps it was a gust of wind rocking the trailer.  He did not hear anything at the back door so he returned toward the bedroom and as he was proceeding,  he heard a loud crash which physically rocked the trailer.

He stated that he grabbed his pistol because of the violence of the repeated crashing that followed.  He went to the front of the trailer, still listening to the banging, which was "exceedingly violent and rapid."  He asked,  "Who is it?" and received no response.  He repeated his question, then stated, "[d]on't kick the door in, I'm armed."  Barrack heard kicking at the door, the door flew open, he backed up, saw a large human form, unidentifiable, rush through the door and then he recalls the "muzzle flash when the gun went off."

PROCEDURAL BACKGROUND

On February 21, 1992, a deputy county attorney of Missoula County filed an affidavit and motion for leave to file an information on Donald Barrack, charging him with committing the offense of aggravated assault, a felony, pursuant to § 45-5-202(1), MCA. The motion was granted on that same day and on March 4, 1992, Barrack was arraigned and pled "not guilty." Trial in the matter commenced on June 29, 1992, and a jury found Barrack guilty of the offense of aggravated assault on June 30, 1992.

On August 5, 1992, Barrack's motion for a new trial was heard and sentence was pronounced against him. He was sentenced to Montana State Prison for 10 years, with all but two years suspended. The final judgment of the court was filed on August 21, 1992, confirming Barrack's sentence of 10 years in prison with all but two years suspended. Later that same day, the District Court filed an order amending the judgment, suspending the entire prison term under certain conditions.

Barrack filed a written motion for a new trial on August 26, 1992. A hearing on the motion for a new trial was held on December 16, and on December 17, 1992, an opinion and order was filed, stating that at an October 14, 1992, post trial hearing, "the Court informed the parties that it [would] treat the Defendant's Motion for New Trial as a Petition for Post Conviction Relief under a Writ of Coram Nobis pursuant to § 46-21-101(1), MCA." The District Court denied the motion for a new trial (petition for post-conviction relief) on the issues of the sufficiency of the evidence

7

and the alleged failure of the State to provide medical reports on the victim's blood alcohol content at the time of the incident. Barrack appealed to this Court on January 5, 1993.

STANDARD OF REVIEW

The standard of review for denial of post-conviction relief is whether substantial evidence will support the findings and conclusions of the district court. Walker v. State (1993), 261 Mont. 1, 6, 862 P.2d 1, 4.

I. POST-CONVICTION RELIEF

Barrack makes two arguments regarding his motion for a new trial - 1) there was insufficient evidence to support the jury's verdict and 2) the State's alleged failure to provide Barrack with the test results of the victim's blood alcohol content on the night of the incident. However, before deciding those issues, we take this opportunity to clarify the District Court's treatment of Barrack's motion for a new trial as a petition for post-conviction relief. In its opinion and order, dated December 17, 1992, the District Court stated that it would treat the motion for a new trial as a petition for post-conviction relief under a writ of coram nobis, pursuant to § 46-21-101(1), MCA.

However, a writ of coram nobis is no longer available as a remedy for post-conviction relief. Section 46-21-101(1), MCA, provides as follows:

> when validity of sentence may be challenged. (1) A person adjudged guilty of an offense in a court of record who has no adequate remedy of appeal and who claims that a sentence was imposed in violation of the constitution or the laws of this state or the constitution of the United States, that the court was without jurisdiction to

8

impose the sentence, that a suspended or deferred sentence was improperly revoked, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack upon any ground of alleged error available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy may petition the court that imposed the sentence or the supreme court to vacate, set aside, or correct the sentence or revocation order.

"The post-conviction hearing statutes are an attempt by the legislature to consolidate all of the common-law statutory remedies normally available to challenge a sentence." In re McNair (1980), 189 Mont. 321, 323, 615 P.2d 916, 917. While the Constitution of Montana (Art. II, Sec. 19) and Title 46, Chapter 22, Parts 1 through 3 of the Montana Code Annotated, provide for separate habeas corpus proceedings, Montana law does not provide for a separate writ of coram nobis.

The State argues that Barrack's motion for a new trial was untimely, should have been denied, and that it was improper to treat the motion as a petition for post-conviction relief. Barrack was found guilty of aggravated assault on June 30, 1992. According to § 46-16-702(2), MCA, a motion for a new trial must be in writing and filed by the defendant within 30 days following a finding of guilty. The State points out Barrack's written motion for a new trial was not filed until August 26, 1992. Therefore, Barrack's motion for a new trial was untimely because it was not filed within 30 days of the verdict and for this reason, the State contends, Barrack's motion should have been summarily denied.

Barrack's motion for a new trial was indeed, untimely. However, under Rule 5, M.R. App. P., he could have filed an appeal

9

within 60 days of the judgment., The judgment in the instant case was filed on August 21, 1992; the last day for Barrack to appeal his case would have been October 21, 1992. However, at a post-trial hearing on October 14, the District Court informed Barrack that it would treat his motion for a new trial as a petition for post-conviction relief. At this point in time, Barrack still could have appealed his case. However, the District Court's decision to treat the motion as a petition for post-conviction relief may have effectively curtailed any attempt Barrack may have made to appeal within the remaining statutory time limit.

Even though Barrack was possibly lulled into inaction as far as appealing during the statutory time limit, he must still be allowed an opportunity to seek review of his case before this Court. In Fitzpatrick v. State (1983), 206 Mont. 205, 210-211, 671 P.2d 1, 4, in discussing § 46-21-101, MCA, the post-conviction relief statute, we stated that:

> The first element of the test which a petitioner must satisfy is that petitioner be "adjudged guilty of an offense in a court of record who has no adequate remedy of appeal..." This phrase does not mean that a petitioner may avail him or herself of the appellate review process, and, when the results are unfavorable, utilize the post-conviction review procedure to, in effect, file numerous and successive "appeals." The language of the statute for part one of the test clearly intends this form of relief to be available to convicted persons who have not had their sentences reviewed by the appellate court. It is clearly an abuse of the relief procedure to withhold issues which could and should have properly been raised on appeal...."

In the instant case, Barrack did not have an opportunity to avail himself of the appellate review process because of the District Court's treatment of his untimely motion for new trial as

10

a petition for post-conviction relief. He effectively did not have an opportunity to properly raise issues on appeal. Moreover,

> [a]buse of process occurs where an applicant raises in post-conviction proceedings a factual or legal contention which the petitioner deliberately or inexcusably failed to raise in the proceedings leading to conviction, or having raised the contention in the court, failed to pursue the matter on appeal.

McKenzie v. Osborne (1981), 195 Mont. 26, 34, 640 P.2d 368, 373. Barrack did not deliberately or inexcusably fail to pursue the matter on appeal because he was unintentionally misled by the District Court, thereby failing to appeal within the proper time period. The abuse of the post-conviction relief process is not a concern in this case because there is no evidence that Barrack intentionally failed to appeal or failed to exercise due diligence in seeking review of the legal issues raised.

The District Court erred in treating Barrack's untimely motion for a new trial as a petition for post-conviction relief under § 46-21-101(1), MCA, and as a writ of coram nobis. Nevertheless, because the District Court possibly lulled the defendant into a position where he did not timely pursue his appeal rights, we will affirm the District Court's decision to rule on the merits of Barrack's untimely motion for new trial.

In doing so we wish to emphasize, however, that our decision here is not in any way to be read as enlarging the scope of post-conviction relief or as diminishing a defendant's obligation to timely file a motion for a new trial and a petition for post-conviction relief or appeal in accordance with the applicable statutes. The circumstances of this case are unique.

11

## II.  INSUFFICIENCY  OF  THE  EVIDENCE

"The standard of review of the sufficiency of the evidence is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Bower (1992), 254 Mont. 1, 6, 833 P.2d 1106, 1110.

Barrack argues that there was insufficient evidence to support the jury's verdict of guilty of aggravated assault.  He contends that:

> Ms. Llewellyn's appearance and demeanor on the witness stand were very sympathetic. No hint emerged of her intoxicated and irrational rage on the night in question.  The defense believes that Mr. Barrack was convicted because the jury's emotions were inflamed by the idea of a former law enforcement officer shooting a woman they perceived as someone he should have recognized under any circumstance.

Finally, Barrack claims that he was the victim, not the aggressor, and that he was acting in self-defense.  At trial, he pled the affirmative defense of justifiable use of force.  Although Barrack argues there was insufficient evidence to support his conviction,

> [t]he fact that the defendant's testimony conflicted with that of the State's witnesses does not, by itself, render the evidence insufficient to support his conviction.  The weight of the evidence and the credibility of the witnesses are exclusively within the province of the trier of fact; when the evidence conflicts, the trier of fact determines which shall prevail.

Bower, 833 P.2d at 1111.  Moreover, in determining whether the use of force was justified, "[t]he mere fact that defendant testified to a self-defense claim does not entitle him to an acquittal;" the trier of fact must weigh the testimony and decide whether Barrack

12

acted with the belief that the use of force was necessary and his belief was reasonable. Bower, 833 P.2d at 1111. In essence, the jury must determine whether the defendant was justified in his use of force when Sue entered the trailer on the evening in question.

In the instant case, the jury weighed the evidence, assessed the credibility of the witnesses and determined that the State's witnesses were more credible. They determined that Barrack was not justified in his use of force against Sue Llewellyn and that he was guilty of aggravated assault. As stated above, the fact that the defendant's testimony conflicts with the State's witnesses does not render the evidence insufficient to support a conviction. Here, the jury's verdict is sufficiently supported by the evidence.

There was testimony that there was adequate lighting for a person inside the trailer to see anyone outside knocking on the doors. Both Sue and Cole testified that Barrack knew Sue well enough to recognize her if he saw her. Moreover, there was testimony that there was enough noise, with the knocking and other sounds being made, that a person inside the house would have heard that there were people outside the trailer. Sue testified that Barrack did not ask" [W]ho are you?" nor did she hear anyone say "I'm armed, [d]on't come in here," or warn her at all when she was entering the trailer. She testified that she did not feel that there was anyone in the trailer at the time she entered.

"The [trier of fact] is not bound to blindly accept defendant's version of the facts. It is free to pick and choose the evidence it wishes to believe." Bower, 833 P.2d at 1111,

13

citing State v. Sorenson (1980), 190 Mont. 155, 170, 619 P.2d 1185, 1194. Here, the jury chose to believe the State and, as stated above, there is sufficient evidence to support the jury's verdict. The District Court did not err in denying Barrack post-conviction relief based on his claim that there was insufficient evidence to support the jury's verdict.

### III. BLOOD ALCOHOL REPORT

Barrack argues that defense counsel was relying on a long-standing course of conduct with the State when it failed to subpoena records of Sue's blood alcohol content for use during the trial. He asserts that his error in failing to discover her blood test is excusable because in the past, the State routinely provided law enforcement reports, including blood test results, upon request by the defense attorneys. Barrack's attorney had requested results from the State and the Sheriff's Office but did not receive them so he was led to believe that there were no test results. The attorney did not realize there were blood test results until he subpoenaed them on August 4, 1992, in preparation for sentencing.

The State contends that Barrack wanted the State to conduct his own discovery for him. It also states that it did not subpoena the blood alcohol records at any time nor did it use any information regarding the blood alcohol content of the victim at trial.

A hearing was held on the issue of the blood alcohol results on December 16, 1992, in which defense counsel testified that he had asked Lt. Brannin and Mr. Van Valkenburg, a deputy county

14

attorney, for blood alcohol reports. Counsel stated that Lt. Brannin told him he did not think that there was a blood alcohol test because she was a Jehovah's Witness. Further, counsel stated that although available from St. Patrick's Hospital, he did not receive a copy of the blood alcohol results until he subpoenaed them for sentencing purposes. He argued at the hearing that if he had known that he was not going to get them through the sheriff's office, he would have gotten them on his own, but he was led to believe that none existed because he had never had a "problem in getting anything from the sheriff's department or county attorney's office in the past, and I think it was just a mistake that they missed it...."

When Brannin testified, he stated that he remembered that the fact that Sue was a Jehovah's Witness was a factor in the case, but that he did not remember any specific request for blood alcohol results. Brannin also testified that he never received a blood alcohol test for Sue, although Brannin did know she had been drinking that evening because she did acknowledge the fact during a police interview. Moreover, Brannin had prepared a memorandum to the deputy county attorney stating that "there was certainly no specific request for this information," referring to the blood alcohol results.

The Deputy County Attorney stated at the hearing that when the defense attorney interviewed Sue, she did tell counsel that she had had "either two or three glasses of wine mixed with 7-Up, or something of that nature, prior to the incident that night."

15

Moreover, the county attorney asserted, she also told Brannin that she had been drinking when she made her statement to the police officer and that statement was made available to the defense but defense counsel never cross-examined Sue on that issue at trial.

The District Court, in its order of December 17, 1992, stated the following:

> Hearing on Defendant's petition was had on December 16, 1992 with defense counsel testifying that he asked State's counsel for blood alcohol results on the victim and was referred to the sheriff's office. Defense counsel further testified that the investigative officer in the Sheriff's office said he did not think there was one because the victim was a Jehovah's witness. The officer testified at hearing that he does not recall the conversation and that his files do not contain blood alcohol results for the victim. Defense counsel subpoenaed the hospital records following trial for sentencing purposes and those records contained blood alcohol results of the victim.
>
> The Court would grant Defendant a new trial if the State had exculpatory evidence in its possession which was not available to Defendant and did not turn over the evidence to defense counsel. However, it does not appear the State had the blood alcohol results on the victim in its possession. The hospital records were equally available to both parties by subpoena and therefore the evidence is not newly discovered evidence which was unavailable for trial and a new trial is not warranted in this case.

We agree with the District Court that it does not appear that the State had blood alcohol results on Sue in its possession. Moreover, the hospital records were available to both parties by subpoena. Defense counsel had information that she had been drinking and if counsel thought that jury knowledge of her drinking may have changed the outcome of the trial, it was counsel's responsibility to request the information from the sheriff's office or county attorney's office in a formal manner if informal requests

16

were of no avail. A written request for the necessary information addressed to the county attorney's office or a request to the District Court for an order requesting that the information be made available to the defendant could have been employed to obtain the blood alcohol results, pursuant to § 46-15-322, MCA.

The problem of the prosecution failing to reveal evidence necessary for a defendant's case is not present here. Lt. Brannin stated that they did not have any reports on Sue's blood alcohol level on the night of the incident and never requested such reports. "Police officers may not frustrate or hamper a defendant's right to obtain exculpatory evidence but they have no affirmative duty to gather such evidence absent express statutory mandate." State, City of Bozeman v. Heth (1988), 230 Mont. 268, 272, 750 P.2d 103, 105. We recently clarified the State's obligation of disclosure under § 46-15-322, MCA, in State v. Licht (1994), ___ Mont. ___, ___, ___ P.2d ___, ___, 51 St. Rep. 686. While, as we pointed out in that case, subsections (L)(a) through (d) and subsections (2)(a) through (c) of that statute require the prosecution to disclose all material and information described, whether inculpatory or exculpatory, and while subsection (l)(e) requires disclosure of all exculpatory or mitigating material or information, there is no obligation under the statute for the State to disclose material or information which it does not have in its possession. Here, neither the prosecution nor the police had the blood alcohol results and they had no affirmative duty to obtain them. Therefore, the District Court did not err when it denied the

17

motion for a new trial (petition for post-conviction relief) based on Barrack's argument that his failure to discover Sue's blood test results was an excusable mistake.

AFFIRMED.

We Concur:

_____
Chief Justice

_____

_____

_____
Justice

_____
Justices

Justice John Conway Harrison, dissenting.

I respectfully dissent. Section 45-3-103, MCA, provides:

Use of force in defense of occupied structure. A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon an occupied structure. However, he is justified in the use of force likely to cause death or serious bodily harm only if:

(1) the entry is made or attempted in violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to him or another then in the occupied structure; or.

(2) he reasonably believes that such force is necessary to prevent the commission of a forcible felony in the occupied structure.

If § 45-3-103, MCA, had been followed by the jury in this case, a not guilty verdict would have resulted. Clearly, the evidence showed that Sue Llewellyn was the aggressor. She broke into an occupied dwelling in the middle of the night by creating a scene and then kicking down the door. Such actions are a clear invasion of defendant's home and he was justified in his use of force in defense of his home. I would reverse and remand for a new trial.

_____
                Justice

19

Justice Terry N. Trieweiler specially concurring in part and dissenting in part.

I concur with the majority's resolution of Issues I and II. I dissent from that part of the majority opinion which concludes that there was sufficient evidence to convict defendant of aggravated assault.

Based on the undisputed evidence, I conclude that justifiable use of force by defendant was established as a matter of law and that judging the evidence in the light most favorable to the prosecution, no rational trier of fact could have found defendant guilty of aggravated assault beyond a reasonable doubt.

Donald Barrack testified that on February 13, 1992, he was awakened in the middle of the night by a blow to his trailer that was so violent it physically rocked the trailer. He went to the back door, but heard nothing further in that vicinity. The next thing he knew, there was a loud crash in the vicinity of the front door of his home, which again physically rocked the trailer as if it had been hit by a motor vehicle. He picked up his pistol and went to the area of his front door where the crashing sound continued. The impact to his home was exceedingly violent and rapid and continued to occur with such force that it rocked his whole trailer. He asked the person outside to identify herself, but received no response. With all the noise described by both Barrack and his neighbor, it is not surprising that the violent and aggressive intruder did not hear his question.

20

He then advised the person outside, "Don't kick the door in, I'm armed." He still received no response, and after several more kicks, the door flew open. He backed away from the door, not knowing who was entering his home. The next thing he observed was a large human form rushing through the door, despite his repeated warnings. He was understandably scared and upset and feared for his safety. He fired his pistol in the direction of the door, striking the intruder.

Defendant testified that at no time prior to firing his pistol in the direction of the intruder did he recognize her as Sue Llewellyn.

Defendant's testimony clearly established the affirmative defense of justifiable use of force in defense of an occupied structure, which is set forth at § 45-3-103, MCA. That statute provides that:

> A person is justified in the use of force or threat to use force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon an occupied structure. However, he is justified in the use of force likely to cause death or serious bodily harm only if:
> (1) the entry is made or attempted in violent, riotous, or tumultuous manner and he reasonably believes that such force is necessary to prevent an assault upon or offer of personal violence to him or another then in the occupied structure; or
> (2) he reasonably believes that such force is necessary to prevent the commission of a forcible felony in the occupied structure.

The majority opinion correctly points out that if defendant's testimony was contradicted in some material respect, it was up to the jury to resolve the factual issue created by that

21

contradiction.  However, defendant's testimony was not contradicted in any material respect.  There were only two witnesses to the incident which formed the basis of the charges against defendant. The other witness was Sue Llewellyn, the person who forcibly and violently broke into his home.  The only relevant part of her testimony related to her activity after her boyfriend left the scene on foot.

She stated that she got back out of her car and returned to defendant's home with the express purpose of breaking in.  She tried the knob, but it was locked.  She kicked the door with as much force as she could until it flew open.  After the door opened, she was not screaming, yelling, or saying anything else that would enable defendant to identify her.  Furthermore, she testified that because of the darkness inside the trailer, she could not see inside.

With her identity concealed by that same darkness, she entered the trailer without identifying herself.  Only at that point was she shot.

Llewellyn acknowledged that she had no right to kick in the door to defendant's home.  She had been warned before going to the trailer that he was still living there, but was angry about his continued presence and intended to do something about it.

Based upon the testimony given by the only two witnesses who have full knowledge of what happened that evening, Llewellyn's entry was made in a violent, riotous, and tumultuous manner, and defendant had every right to believe that force likely to cause

22

seriously bodily harm was necessary in order to prevent an assault on himself.

It is truly shocking that a person abruptly awakened in the middle of the night by an unknown intruder who violently and forcibly breaks into to his or her home, can be convicted of a felony punishable by 20 years in the State Prison and a fine of $50,000 for taking reasonable measures to protect himself.

While the prosecutor, the jury, and the majority may, with the benefit of hindsight, conclude that defendant was not in danger of serious bodily harm from Llewellyn's violent assault on his home, defendant did not have the benefit of hindsight, anymore than he had the benefit of knowing the intruder's identity or intentions before making his split-second decision to defend himself.

He had no way of knowing whether the intruder was armed or unarmed. However, based upon the intruder's disregard for his warning, and based upon the manner of her entry, he had every right to presume that her intentions were hostile and a threat to his well-being.

For these reasons, I dissent from that part of the majority opinion which concludes that there was sufficient evidence to convict defendant of aggravated assault. I would reverse the judgment of the District Court and remand for entry of judgment dismissing all charges against defendant, Donald Barrack.

_____
Ju  ice

Justice William E. Hunt, Sr., joins in the foregoing concurring and dissenting opinion.

_____
Justice